ARBITRATION SERVICE OF PORTLAND

**BIBIJI INDERJIT KAUR PURI**, an
individual,

      Claimant,

  v.

**GOLDEN TEMPLE OF OREGON, LLC**,
an Oregon Limited Liability Company,

      Respondent.

ASP No. 100614

**FINDINGS OF FACT AND
NOTICE OF AWARD**

This is a trademark dispute wherein Claimant contends that Claimant is the owner of trademark rights in the marks YOGI TEA and YOGI, that Respondent has infringed those rights, that Claimant is the rightful owner of trademark registrations and applications for those marks, and that Respondent has breached a trademark license agreement. A hearing was held January 10-19, 2011 in Portland, Oregon before a Panel of the undersigned arbitrators.

**History of Yogi Bhajan and Yogi Tea**

Harbhajan Singh Khalsa Yogiji (HSKY), also known as Yogi Bhajan, Yogiji, and by the religious title, Suri Singh Sahib, came to the United States in the late 1960s and began teaching Kundalini Yoga classes in Los Angeles. An inspirational and charismatic teacher, he founded a community of people intent upon leading a spiritual life founded upon the principles of Kundalini Yoga and a healthy lifestyle consistent with Ayurveda, a traditional Indian system of medicine. The community's name for itself is 3HO – Healthy, Happy, Holy Organization.

Yogi Bhajan became known for serving an herbal tea at his Kundalini Yoga classes. The tea was known as Yogi Tea. As the 3HO community expanded and built ashrams throughout the

PAGE 1 – FINDINGS OF FACT AND NOTICE OF AWARD

United States and around the world, it was common for Kundalini Yoga instructors to serve Yogi Bhajan's Yogi Tea at yoga classes.

Yogi Bhajan encouraged members of the 3HO community to support themselves by establishing businesses which employed 3HO members. Among the early 3HO businesses were Golden Temple Conscious Cookery restaurants ("Golden Temple restaurants") where YOGI TEA was listed on the menus, served to customers and sold as loose tea in cellophane bags. It does not appear to the Arbitration Panel that the Golden Temple restaurants – which were located in many U.S. cities – were commonly owned.

In the early 1980s, three members of the 3HO community in Los Angeles started a company called Golden Temple Tea Company to sell YOGI TEA. At some point the Golden Temple Tea Company began doing business as the "Yogi Tea Company." Respondent Golden Temple of Oregon, LLC ("GTO") is the ultimate successor to the Golden Temple Tea Company. The Golden Temple restaurants, different legal entities than the Golden Temple Tea Company, continued to include YOGI TEA on their menus, serve YOGI TEA and sell loose YOGI TEA. YOGI TEA continued to be served at Kundalini Yoga classes taught by Yogi Bhajan, his students, or other members of the 3HO community.

The Golden Temple Tea Company, dba Yogi Tea Company got its start by selling pre-packaged YOGI TEA to Golden Temple restaurants and Golden Temple Natural Foods Stores (another 3HO community business). Golden Temple Tea Company gradually grew its sales to include other natural food stores and grocery stores that sold health food products. At some point the Golden Temple Tea Company, dba Yogi Tea Company was reorganized as Yogi G., Inc., which continued to do business as Yogi Tea Company. Some time thereafter, the three founders of Golden Temple Tea Company donated the company to Sikh Dharma, a non-profit

PAGE 2 – FINDINGS OF FACT AND NOTICE OF AWARD

corporation controlled by Yogi Bhajan. It appears to the Panel that the donation was at the suggestion of Yogi Bhajan. In the early 90's, Yogi G., Inc. merged with Respondent Golden Temple of Oregon, LLC ("GTO") – another 3HO community business which had been donated to Yogi Bhajan's Sikh Dharma non-profit corporation. Prior to merger with Yogi G., Inc., GTO had been in the business of selling cereal and baked products. After the merger GTO sold YOGI TEA, and continued to sell cereal and baked products. Some of the cereal and baked products were sold in connection with Yogi Bhajan's name and likeness, and more recently the trademark YOGI. Although GTO sold its cereal business in 2009, it continues to sell YOGI TEA to this day. In 2009, sales of YOGI TEA exceeded $27 million.

**Agreements with Yogi Bhajan Regarding YOGI TEA**

The Panel received testimony concerning an initial oral license between Yogi Bhajan and the founders of Golden Temple Tea Company, dba Yogi Tea Company. While no written record of this agreement was produced, the agreement was described by GTO's witnesses as primarily as a "recipe" license to sell YOGI TEA.

In 1993 Yogi G. dba Yogi Tea Company, and predecessor to Respondent GTO, entered into a written recipe license with Yogi Bhajan. The 1993 license agreement also included a trademark clause, specifically granting Yogi G the right to sell tea under the name "YOGI BHAJAN'S YOGI TEA." Ten years later in July 2004, Respondent GTO entered into a written trademark license agreement with the Harbhajan Singh Khalsa Yogiji and Inerjit Kaur Living Trust. Yogi Bhajan was the Trustee of the Living Trust, and he and his wife, Bibiji Inderjit Kaur Puri, were the Trustors. Ms. Puri is the Claimant in this proceeding. The parties agree that the 2004 license gave GTO the right to use Yogi Bhajan's name, likeness and signature ("name and

likeness") as trademarks to sell tea, cereal, and herbal products. The parties disagree whether the disputed trademarks, "YOGI TEA" and "YOGI" are covered by the 2004 license.

Katar Singh Khalsa, president of Respondent GTO, testified that the 2004 trademark license was essentially a substitute for the previous 1994 recipe license, and that both licenses were motivated by respect for Yogi Bhajan and were devices to provide Yogi Bhajan a stream of income in the form of royalties, a portion of which Yogi Bhajan would use to fund "his non-profits," such as Sikh Dharma.

Throughout the history of YOGI TEA, Respondent GTO and its predecessors Yogi G. and Golden Temple Tea Company have sought to create an association with Yogi Bhajan. Yogi G. and Golden Temple Tea Company did business as Yogi Tea Company. For decades, packaging, websites, and advertising for YOGI TEA by GTO and its predecessors had emphasized a connection with Yogi Bhajan, including:

   a.    attributing the origin of YOGI TEA to Yogi Bhajan;

   b.    displaying a picture, name, and signature of Yogi Bhajan;

   c.    using sayings or quotations attributed to Yogi Bhajan;

   d.    using the phrase "YOGI BHAJAN'S YOGI TEA;"

   e.    proclaiming that "the Yogi behind Yogi Tea is Yogi Bhajan;" and

   f.    identifying Yogi Bhajan as "Founder."

**Yogi Bhajan's Death and the Aftermath**

Yogi Bhajan died in October 2004, just days after entering into a second version of the 2004 Agreement extending the term of the 2004 license from 10 years as set forth in the July 2004 agreement, to 75 years set forth in the October 2004 agreement. From 2004 through 2008, GTO paid royalties under the 2004 Agreement to a trust for the benefit of Claimant. Claimant

has revoked her trust, and is the successor-in-interest to her trust. Royalties were also paid to a second trust (the "Staff Trust") set up by Yogi Bhajan prior to his death to provide for his staff of women who helped him handle the administrative tasks related to managing the 3HO community and its various businesses and organizations.

In 2008 Respondent GTO decided that it no longer wanted to use Yogi Bhajan's name and likeness on its products and ceased paying royalties to Claimant and the Staff Trust. However GTO continued to use the mark YOGI TEA and introduced a derivative brand consisting merely of "YOGI." At approximately the same time, the management of GTO obtained ownership of GTO and of KIT BV, a Dutch company formed by European members of the 3HO community. Under the new organizational structure, GTO was to pay its subsidiary KIT BV $8 million per year, and a new entity, Golden Temple Management, LLC, was to receive 90% of the remaining profit. GTO president Katar Khalsa testified that the management of GTO was not willing to continue to operate GTO without an equity stake in GTO. Subsequent to the reorganization, there was a significant increase in compensation for Golden Temple management. It is not clear to the Panel whether GTO still pays any money to the 3HO community non-profits or exactly how management of GTO gained control of the company from the 3HO non-profits. Although there are further disputes within the 3HO community, including a dispute between the Claimant and the Staff Trust, the matters to be decided by this Panel are limited to the claims against Respondent GTO set forth in Claimant's First Amended Demand for Arbitration.

Trademark Registrations and Applications

Respondent GTO is the owner of a number of U.S. trademark registrations and applications including YOGI TEA for tea and YOGI for tea, cereal and granola. The first registration, YOGI TEA for tea, was applied for in 1994 by GTO's predecessor Yogi G. based upon first use of the mark in 1983. Yogi Bhajan never objected to registration of YOGI TEA by Yogi G. Pursuant to U.S. trademark laws, that registration, issued in 1996, is now incontestable and cannot be cancelled except upon very limited grounds. It does not appear to the Panel that Claimant has established a basis under law to cancel the 1996 YOGI TEA registration. The other registrations and applications owned by GTO are within the period during which cancellation or opposition proceedings may be brought.

Ownership of YOGI TEA and YOGI

YOGI appears to have been adopted by GTO in December 2008, at about the same time GTO was cancelling its license with Claimant to use the name and likeness of Yogi Bhajan. The Panel believes that the relatively new mark YOGI is derivative of the pre-existing YOGI TEA brand and of other Yogi-names and phrases used by GTO and its predecessors, specifically including references to Yogi Bhajan.[1] Thus a decision with respect to ownership of YOGI TEA will likewise apply to ownership of YOGI, and will substantially resolve many issues in dispute. Neither party has asserted that trademark rights in YOGI are differentiated from trademark rights in YOGI TEA.

---

[1] *e.g.,* "The Yogi Behind Yogi Tea is Yogi Bhajan"

PAGE 6 – FINDINGS OF FACT AND NOTICE OF AWARD

Respondent GTO claims that through its predecessors, Yogi G., Inc. and Golden Temple Tea Company (both doing business as Yogi Tea Company), GTO was the first to make commercial use of YOGI TEA as a trademark. GTO claims that it has used the mark YOGI TEA continuously since the early 1980's and therefore owns YOGI TEA and it is entitled to continue to use YOGI TEA and the newly adopted mark YOGI, even though it has ceased making payments to Claimant and the Staff Trust under the 2004 License. GTO claims that Yogi Bhajan never made commercial use of YOGI TEA for tea. GTO claims that the first two agreements with Yogi Bhajan were not trademark licenses and points out that they did not have the usual trappings of a trademark license, such as a quality control provision. GTO asserts that even if there was an oral license between Yogi Bhajan and GTO's predecessors granting the predecessors the right to use YOGI TEA, such a license is void as a "naked license" since Yogi Bhajan did not have the right to exercise quality control, and did not in fact exercise quality control.

GTO also points out that the 2004 license specifically identifies "name and likeness" as trademarks, but does not identify YOGI TEA as a trademark, and that a similar license agreement between Yogi Bhajan and the European company 3HO Amalgamated (parent of KIT BV), specifically mentioned YOGI TEA as a trademark – thereby raising the inference that the mark YOGI TEA was deliberately omitted in the 2004 license between GTO and Yogi Bhajan.

Further, GTO asserts that Yogi Bhajan encouraged the members of the community to start businesses to support the community, but that Yogi Bhajan never took ownership interests

PAGE 7 – FINDINGS OF FACT AND NOTICE OF AWARD

in the companies.  It is uncontroverted that Yogi Bhajan was never an owner, officer or director of GTO or its predecessors.

In response Claimant asserts that Yogi Bhajan managed all of 3HO community businesses and organizations and closely monitored and controlled their operations.  Claimant points out that YOGI TEA originated with Yogi Bhajan, and contends that all commercial uses of YOGI TEA by the Golden Temple restaurants, the Golden Temple Tea Company (dba Yogi Tea Company), Yogi G. (dba Yogi Tea Company), and GTO were always with Yogi Bhajan's permission.  Claimant also asserts that Yogi Bhajan had the right to control any activities of the 3HO community businesses – and did so, even to the extent of directing their owners to donate the businesses to Sikh Dharma and directing that Katar Khalsa be President of GTO.  One witness and several exhibits referred to Yogi Bhajan as "CMA," i.e., Central Management Authority.  Claimant's witnesses gave specific examples of Yogi Bhajan's exercise of control over GTO and its predecessors, and his exercise of quality control.  Claimant refers to the pervasive attempts by GTO and its predecessors to use Yogi Bhajan to promote YOGI TEA, emphasizing GTO's use of the phrase "the Yogi behind Yogi Tea is Yogi Bhajan" and that the 1993 license agreement granted Yogi G. permission to use YOGI BHAJAN'S YOGI TEA.

**Analysis**

The notion of ownership within the 3HO community is fluid.  Yogi Bhajan encouraged his students to form businesses.  Although he may not have been an owner, he had tremendous influence over the conduct of those businesses.  For example, a 2005 article in *Aquarian Times* written by Sada Sat Singh, a witness for GTO and one of the founders of GTO predecessor Golden Temple Tea Company, stated " …Yogi Tea is one of Yogi Bhajan's greatest business accomplishments…"  The article gave other examples of Yogi Bhajan's influence and control of

Golden Temple Tea Company and its successors. The dealings between Yogi Bhajan, the 3HO community, and the for-profit and non-profit 3HO organizations were not arms-length transactions. Yogi Bhajan's overarching plan was to use the 3HO for-profit businesses to support and benefit the 3HO community.

While the parties agree that the phrase Yogi Tea originated with Yogi Bhajan, the close-knit relationships among the 3HO community entities make it difficult to identify traditional trademark milestones such as "adoption," "first use," "first use in interstate commerce," "consent," and "quality control," all of which are relevant to trademark ownership. For example, using traditional trademark analysis, first use of YOGI TEA as a trademark in commerce was probably by the Golden Temple restaurants. However, it does not appear as if these restaurants were commonly owned. Thus, unless use of YOGI TEA by the restaurants was with the permission of Yogi Bhajan or some other single entity, a number of independent restaurants were using YOGI TEA concurrently, and YOGI TEA did not designate a single source—at least during the time of such use. Designation of a single source is the very definition of a trademark. Formation of the Golden Temple Tea Company dba Yogi Tea Company added another independently owned 3HO organization that was using YOGI TEA concurrently with the independently owned 3HO restaurants.

The Panel also received evidence that use of YOGI TEA by all 3HO community businesses, including GTO and its predecessors, and the European 3HO community, was with the permission of Yogi Bhajan. Sada Sat Singh testified that a Golden Temple restaurant in Massachusetts began selling YOGI TEA commercially with the permissions of Yogi Bhajan and later sold the tea business to a tea shop in Maryland. Only after the tea shop ceased commercial sales of YOGI TEA was the way clear for Golden Temple Tea Company to sell YOGI TEA

PAGE 9 – FINDINGS OF FACT AND NOTICE OF AWARD

commercially.   This testimony suggests that one of the founders of Golden Temple Tea Company recognized that Yogi Bhajan had the right to control use of YOGI TEA.   The other two founders of Golden Temple Tea Company testified for Claimant that the company's use of YOGI TEA was with Yogi Bhajan's permission.

Repeated references to Yogi Bhajan and his likeness to advertise and sell YOGI TEA, both before and after the 2004 license, strongly suggests that use of YOGI TEA by GTO and its predecessors was with Yogi Bhajan's permission.   A steady royalty stream to Yogi Bhajan (or his heirs) from sale of YOGI TEA from 1983 to 2008, also suggests that use of YOGI TEA was with Yogi Bhajan's permission.   While at least some of these payments came pursuant to a recipe license, the recipe was generally known, and GTO's president acknowledges that the recipe licenses were merely a way to funnel money to Yogi Bhajan.   The 1993 license is particularly instructive since it is the first written license of record and contains a clause which specifically grants Yogi G. permission to use "YOGI BHAJAN'S YOGI TEA."

On the basis of the information above, the Panel concludes that substantially all of the use of YOGI TEA by the Golden Temple restaurants, and by GTO and its predecessors, was with the express or implied permission of Yogi Bhajan, and that Yogi Bhajan's heirs own the trademark YOGI TEA.

There is a further and equally persuasive basis for finding that Yogi Bhajan's heirs are owners of the trademark YOGI TEA.

In paragraph 5.2 of the 2004 license GTO acknowledges that the name, likeness and signature of Yogi Bhajan are trademarks belonging to Yogi Bhajan.   Even before the 2004 license, GTO and its predecessors had created trademark rights in Yogi Bhajan's name and likeness by using the name and likeness to market and sell tea.   The 1993 license and the totality

PAGE 10 – FINDINGS OF FACT AND NOTICE OF AWARD

of the circumstances demonstrate that use of his name and likeness was with Yogi Bhajan's permission. It is basic trademark law that use of a trademark by a licensee inures to the benefit of the trademark owner. Thus it was not necessary for Yogi Bhajan to personally use his name and likeness as trademarks since use by licensees GTO and its predecessors created trademarks rights in his name and likeness. These trademarks are now owned by Yogi Bhajan's heirs, including Claimant. Yogi Bhajan's heirs therefore have the right to use Yogi Bhajan's name and likeness as trademarks for tea. In contradiction to GTO's arguments that Claimant does not own any trademark rights in Yogi Bhajan's name and likeness, GTO's letter to Yogi Bhajan's heirs terminating the 2004 agreement (Ex. 35) offered to " … surrender any ongoing rights they (GTO) have to Yogi Bhajan's name and likeness in case you (heirs) want to license Yogi Bhajan's name and likeness to someone else."

Notwithstanding GTO's several acknowledgements of Claimant's trademark rights in Yogi Bhajan's name and likeness, GTO CEO Katar Khalsa testified that use of Yogi Bhajan's name and likeness by Claimant as trademarks for tea would infringe GTO's rights to use YOGI TEA and YOGI for tea. The premise for "infringement" is a "likelihood of confusion," and the Panel agrees with GTO's CEO that such use by Claimant would cause a likelihood of confusion. Therefore, GTO cannot hold trademark rights in YOGI TEA and YOGI that are independent from the acknowledged trademark rights in Yogi Bhajan's name and likeness owned by Claimant.

Over the years GTO and its predecessors created a "family" of Yogi marks for tea, including "YOGI TEA," "Yogi Bhajan," the likeness of Yogi Bhajan, the phrase "The Yogi behind Yogi Tea is Yogi Bhajan," "YOGI BHAJAN'S YOGI TEA," and the more recently adopted "YOGI," and represented to the public that tea and other products sold under this family

PAGE 11 – FINDINGS OF FACT AND NOTICE OF AWARD

of marks came from a single source. It cannot now claim ownership of some of the marks in that family while acknowledging that other marks in the family are owned by Claimant.

The Panel finds that the heir(s) of Yogi Bhajan, including Claimant, are the owner(s) of the trademarks YOGI TEA and YOGI for tea and any other products such as cereal and granola that have been sold in connection with the marks. The Panel does not make findings as to the ownership of YOGI TEA and YOGI outside of the United States, and does not make findings as to ownership of the marks between Claimant and any other person.

**Findings and Notice of Award**

With respect to the individual claims set forth in Claimant's First Amended Demand for Arbitration, the Panel finds that:

1.      Respondent GTO has no rights in the marks YOGI TEA, YOGI, and the other "Yogi-marks" discussed herein.

2.      Respondent GTO is liable for infringement of the trademarks YOGI TEA and YOGI under the common law and 15 U.S.C. §1125(a).

3.      U.S. Trademark Registration Nos. 1980514 for YOGI TEA, 3435101 for YOGI TEA and Design, and 3607792 for YOGI, and U.S. Trademark Application Serial Nos. 77636305 and 77889992 for YOGI were obtained or applied for by Respondent GTO and/or its predecessors in their capacity as licensees of Yogi Bhajan or his heirs, and GTO and/or its predecessors had no right to register such marks in their names. Therefore such registrations and applications are held in trust by GTO for Yogi Bhajan and his heirs.

4.      Respondent GTO is   directed to assign the Trademark Registrations and Applications listed in paragraph 2 above, along with the respective marks and the good will associated with the marks, to Claimant.

5.      Respondent GTO is enjoined from use of YOGI TEA, YOGI, Yogi Bhajan, or any other word or device which when used in connection with its respective goods or services is likely to cause confusion with the use of YOGI TEA, YOGI, or the other Yogi-marks discussed herein with tea, granola or cereal products.  The Panel intends that such an injunction take effect January 1, 2012 to provide Respondent GTO time for an orderly phase-out of the marks.

6.      Respondent GTO has breached the 2004 license by applying for registration of and seeking to obtain ownership of marks confusingly similar to the Licensed Trademarks shown in Exhibit 1.4 of the 2004 license.[2]

7.      Claimant is entitled to damages for trademark infringement beginning January 1, 2009 through January 1, 2012.  After considering the various measures that could be applied to calculate damages, and the relevant evidence and expert opinions, the Panel intends to award damages to Claimant based on a reasonable royalty during the period of infringement and phase-out, together with pre-judgment and post-judgment interest.

Respondent's expert has calculated unpaid royalties under the license agreement, in Schedule 3.1 of Exhibit 166 on products branded with YOGI TEA and/or YOGI for the period January 2009 through 2010 to be $1,644,605.  Respondent's expert determined that Claimant's 50% interest therein is $822,302. This calculation is supported by Schedules 3.2 *Gross Sales and Deductions for Yogi Tea – 2009 and 2010* and Schedule 3.3 *Gross Sales and Deductions for Yogi Cereal – 2009 and 2010.*

---

[2] The parties disagree as to whether YOGI TEA and YOGI are "Licensed Trademarks" under the 2004 License Agreement.  However, in view of the findings herein that use of YOGI TEA and YOGI infringe Claimant's rights under the common law and the Lanham Act, and that YOGI TEA and YOGI are confusingly similar to the Licensed Trademarks, it is unnecessary to determine whether they are Licensed Trademarks under the Agreement. The Panel notes that YOGI is a name "used by or identifying" Yogi Bhajan pursuant to Section 1.2 of the 2004 Agreement.

PAGE 13 – FINDINGS OF FACT AND NOTICE OF AWARD

Claimant's initial expert report (Exhibits 608 and 609) did not include a calculation for royalties based on sales in 2009 and 2010. In response to the Panel's request, Claimant submitted this calculation in Schedule B to her Post-Arbitration Brief. Claimant's Schedule B states a value for her 50% interest in unpaid royalties for YOGI brand products sold between January 2009 and November 2010 of $883,955. Claimant's method of calculation for these royalties is not as clear nor as well supported as the calculation by Respondent's expert.

The Panel therefore finds that damages for trademark infringement for the period from January 2009 through October 2010 are $822,302. The Panel further finds that Claimant is entitled to reasonable royalty damages from November 1, 2010 through January 1, 2012 for products branded with YOGI TEA, YOGI, or any of the Yogi-marks. Such damages shall be calculated in the same manner used by Respondent's expert to calculate royalties under the License Agreement as reflected in the schedules attached to Exhibit 166.

8.     The Panel finds that Claimant failed to prove that she is entitled to payment for underpayment of royalties prior to January 2009. Respondent's expert, in Exhibits 166 and 167, points out numerous deficiencies in Claimant's calculation of underpayment of royalties. The Panel is persuaded that there is not enough evidence of record upon which to base an award.

In its Post-Arbitration Brief re Question No. 4, Respondent requests that any damages be offset by overpayments of royalties Respondent contends it paid from 2004-2008. The request for this offset was not pleaded by Respondent nor was it raised in Respondent's Pre-Arbitration Memorandum.

The Panel declines to award Claimant any amount of underpaid royalties alleged to occur prior to January 2009, and declines to offset Claimant's damages award by any amount of overpaid royalties.

9.      Claimant is the "prevailing party," and pursuant to paragraph 19 of the 2004 Agreement is entitled to recovery of reasonable costs and attorney fees.  Within 14 days from receipt of these Findings of Fact and Notice of Award, Claimant shall submit a cost bill and an accounting of attorney fees in accordance with Rules 33 and 34 of the Arbitration Rules of the Arbitration Service of Portland, Inc.  The attorney fees requested should be calculated and supported using the lodestar method and the "Kerr factors" as set forth in *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087 (9th Cir. 2011).  Respondent may submit written objections to Claimant's cost bill and attorney fees as provided in Rule 34 of the Arbitration Rules.

Submission of Proposed Award

Claimant is directed to submit within 14 days of receipt of these Findings of Fact and Notice of Award a proposed award consistent with these findings and in accordance with the Arbitration Rules (*see* Rules 30 and 31 in particular).  A sample form of award suggested by the Arbitration Service of Portland is attached hereto.  Respondent may submit written objections or remarks to Claimant's proposed award within 14 days of receipt of Claimant's proposed award.

**ARBITRATION SERVICE OF PORTLAND, INC.**     Dated July 29, 2011

J. Peter Staples
Chief Arbitrator

Alan T. McCollom
Arbitrator

Jeffrey M. Edelson
Arbitrator

PAGE 15 – FINDINGS OF FACT AND NOTICE OF AWARD